# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| **United States of America** | Case No. 3:24-CR-159 (KAD) |
| v. | |
| **Alyson Cranick,** | **FILED UNDER SEAL** |
| Defendant. | March 6, 2026 |

## GOVERNMENT'S SENTENCING MEMORANDUM

*"This crime robbed my son of his trust, his joy, and
his natural curiosity about the world."*

- Victim Impact Statement ("VIS") to
the Court by M.V.'s Mother

Over the course of the summer of 2022, Alyson Cranick used her position as a trusted family friend, ██████████████████ to systematically groom and sexually assault M.V., an 11-year-old boy.[1] Ms. Cranick exploited the trust that M.V.'s family placed in her—████████████████████████ —to gain private access to the victim. She then leveraged that access to repeatedly sexually assault M.V. over 10 times by coordinating late-night meetings over Discord and driving M.V. to secluded locations to perpetrate those assaults, all under the guise of a romantic relationship with M.V. By the time the abuse ended in September 2022, ██████████████████.

---

[1] To protect the identity of the minor victim, the government refers to him within this memorandum as "M.V."

Ms. Cranick's conduct was not impulsive or time-limited. It was calculated and ongoing. She migrated her communications with M.V. to a platform his mother would not monitor. She hid in bushes outside his home at night and fed him real-time surveillance information about which of his family members was still awake to help him sneak out undetected. She coached him to lie to his parents. She bought him gifts designed to build trust with M.V. while avoiding his parents' suspicions. And when M.V. decided to end the abuse—telling Ms. Cranick he could not continue "physically and mentally" and that "no means no"—she persisted. The abuse stopped only because a ████ child had the fortitude to block his abuser.

On November 18, 2025, just two weeks before jury selection, Ms. Cranick pleaded guilty to one count of coercion or enticement of a minor in violation of 18 U.S.C. § 2422(b). The Guidelines recommend a sentence of life imprisonment. The government agrees that a significant sentence is warranted and, for the reasons explained below, submits that a sentence of 240 months is sufficient, but not greater than necessary, to achieve the goals of sentencing.

1.    **Offense Conduct**

A detailed recitation of the undisputed facts appears in the Presentence Report (PSR ¶¶ 6–45, ECF No. 66). A summary of the relevant facts is provided below.

1.1.    **Ms. Cranick's Relationship with M.V. and His Family**

In 2022, Ms. Cranick resided with her family in Columbia, Connecticut, near Columbia Lake. (PSR ¶ 8.) M.V., who was 11 years old and about to enter the seventh

grade, ████████████████████████████████████████.[2] (*Id.*) M.V.'s

family considered Ms. Cranick a trusted family friend. (*Id.*) Because of the closeness

between the two families, Ms. Cranick had regular, private access to M.V. (PSR ¶ 9.)

████████████████████████████████████████████████████

████████████████████████. (*Id.*) During these outings, Ms. Cranick began testing

boundaries, teasing the children to kiss in front of her ████████████████████

████████████████████. (*Id.*)

    As she purposely grew her connection with M.V., she initially communicated

with him over Snapchat and iMessage. (PSR ¶ 11.) Because M.V.'s mother would read

the messages on his phone, Ms. Cranick and M.V. agreed to switch to Discord, an

application used principally by video gamers, to conceal their communication from

his parents. (*Id.*)

    Notably, M.V. was not the only minor with whom Ms. Cranick regularly com-

municated. Ms. Cranick also cultivated relationships with other children ████████

████████████████████, buying them candy and spending time with them. (PSR ¶ 10.)

A supervisory lifeguard interviewed in advance of trial ("Lifeguard-1" in the PSR)

reported that she was aware that Ms. Cranick chatted over social media with other

lifeguards on her staff, who were under the age of 18 at the time. Moreover, Ms.

Cranick violated her conditions of release imposed in state court by communicating

with a 13-year-old girl on Snapchat after her initial arrest on state charges and in

spite of court orders to have no unsupervised contact with minors. (*See* PSR ¶ 75.)

---

[2] ████████████████████████████████████████████

### 1.2.    The Sexual Assaults

In the summer of 2022, Ms. Cranick took her existing relationship with M.V. and his family to lure him out of his home and initiate sexual contact with him. (PSR ¶ 13.) █████████████████████████████████████████████████████████ ███████████, Ms. Cranick asked him to sneak out of his home so they could talk privately. (*Id*.) M.V. did so, expecting a conversation, but Ms. Cranick instead initiated physical contact. (*Id*.) After that, Ms. Cranick continued to encourage M.V. to sneak out, and Ms. Cranick escalated the relationship to sexual intercourse. (*Id*.)

From that point forward, Ms. Cranick would persuade M.V. to sneak out of his home once or twice a week, between midnight and 3:00 a.m., to meet her. (*Id*.) In total, M.V. estimated that Ms. Cranick had sexual intercourse with him more than 10 but fewer than 20 times. (PSR ¶ 15.) Ms. Cranick told M.V. she was using contraception, and neither used protection during these encounters. (PSR ¶ 15(i).) Ms. Cranick drove M.V. to various locations for these assaults, ███████████████████████ ██████████████████████████████████████████████████—and locations along the Salmon River in Colchester. (*See* PSR ¶ 15(i)–(iii).)

Ms. Cranick's meetings with M.V. followed a deliberate pattern. (PSR ¶ 14.) She used Discord to arrange the meeting, then she drove to M.V.'s house or to Columbia Lake, sometimes parking down the street and hiding near a bush at a neighbor's residence. (*Id*.) She would feed M.V. real-time information over Discord about which lights were on in his home and who appeared to be awake, helping him sneak out

undetected. (*Id.*) Her vehicle had tinted windows, which helped to conceal what was happening inside it. (PSR ¶ 15(iii).)

Throughout the relevant time period, Ms. Cranick groomed M.V. with gifts. (PSR ¶ 16.) These included candy and energy drinks, the latter specifically because M.V. expressed reluctance to meet her because he was too exhausted the next day. (*Id.*) On one occasion, M.V. expressed interest in an expensive airsoft gun. (*Id.*) Ms. Cranick offered to buy it for M.V., but he declined because he could not explain the purchase to his parents. (*Id.*) Ms. Cranick then gave him approximately $400 to $600 in cash, reasoning that money would attract less attention. (*Id.*) She also made M.V. a bracelet inscribed with the coded initialism "BFFLWB"—a reference to "Best Friends Forever With Benefits"—and coached him on a cover story for its meaning. (PSR ¶¶ 27, 29.)

### 1.3.  Discord Communications

Between July and October 2022, Ms. Cranick and M.V. exchanged over 4,700 messages on Discord. (PSR ¶ 23.) The messages were consistent with a dating relationship, including sharing emojis and telling each other "I love you" and "I miss you." (*Id.*) Throughout these messages, Ms. Cranick encouraged M.V. to sneak out, coached him on how to lie to his mother, and sent him messages laden with sexual innuendo that M.V. often responded to with confusion or naivete. (PSR ¶¶ 24–36.)

Ms. Cranick also used emotional manipulation to induce M.V. to meet with her. (PSR ¶ 35.) When M.V. told Ms. Cranick he was too tired to sneak out, she responded that she did not want to be "up all night again crying" and that she "really

really need[ed] this." (PSR ¶ 36.) When M.V. pointed out that he "can't be going out every night," Ms. Cranick replied, "It's not every night," and M.V. corrected her: "It's most nights." (*Id*.)

### 1.4.    Initial Reporting to the Connecticut State Police

In addition to Ms. Cranick's night-time abuse of M.V., she also spent time with him during the day, sometimes at the town lake. The lifeguards at the lake found Ms. Cranick's and M.V.'s visits to be unnerving and odd: They observed her coming to the lake without her own children, waiting for M.V., isolating herself with him, and acting like a "schoolgirl" around him. (PSR ¶ 17.) One lifeguard saw Ms. Cranick sitting inappropriately close to M.V. with her hand on his shorts or thigh. (*Id*.) The staff became so concerned that they sometimes spent more time monitoring Ms. Cranick and M.V. than watching the lake. (PSR ¶ 19.) These primarily teenaged lifeguards eventually reported their observations to the Connecticut State Police ("CSP"). (*Id*.) At the time, Ms. Cranick denied any wrongdoing, and M.V. was not yet ready to disclose the abuse to his parents. (*Id*.) Accordingly, even after CSP was alerted to a potentially problematic relationship, Ms. Cranick used the trust M.V.'s family placed in her to brush aside the credible allegations of inappropriate contact with him.

### 1.5.    M.V. Ends Contact with Ms. Cranick

Toward the end of the summer, M.V. began to realize that his relationship with Ms. Cranick was wrong. (PSR ¶ 21.) He was frequently tired and sleep-deprived, which caused behavioral problems and conflict at home. (*Id*.) He began distancing

himself from Ms. Cranick, using a foot injury as an excuse to avoid sneaking out at night. (*Id.*)

Ms. Cranick persisted. On September 3, 2022, she tried to arrange a meeting, but M.V. refused repeatedly. (PSR ¶ 37.) On September 9, she attempted again, telling M.V. she had gifts for him. (PSR ¶ 39.) M.V.—████████████████—responded: "No. We arnt hanging out. I can't. Physically and mentally." (*Id.*) When Ms. Cranick continued to press, M.V. said: "I said no and no means no." Ms. Cranick still persisted. M.V. eventually blocked her on Discord. (PSR ¶ 40.)

### 1.6.    Report to the CSP

Despite M.V.'s efforts to end the relationship, Ms. Cranick remained part of his daily life. ████████████████████████████████████████████████████████.
(PSR ¶ 21.)

M.V. did not disclose the abuse until September 2023. (PSR ¶ 22.) That disclosure was precipitated by his mother's discovery of bloody tissues in the home. (*Id.*) After inspecting M.V.'s arms and finding evidence of self-harm, including fresh cuts, his mother questioned him, and M.V. disclosed that Ms. Cranick had sexually assaulted him. (*Id.*) His mother immediately notified the CSP. (*Id.*)

When investigators interviewed Ms. Cranick, she denied any inappropriate contact. (PSR ¶ 41.) She claimed that M.V. had attempted to kiss her, shifting blame to him. (*Id.*) An examination of M.V.'s phone revealed that Ms. Cranick's number had

interacted with his device 3,930 times, of which Ms. Cranick initiated 3,768—over 96 percent. (PSR ¶ 43.)

## 2.    Procedural History, Penalties, and Guidelines Calculation

Ms. Cranick was charged by criminal complaint on July 2, 2024, (ECF No. 1), and arrested July 24, 2024, (*see* ECF No.11). A federal grand jury returned an indictment charging her with one count of coercion or enticement of a minor in violation of 18 U.S.C. § 2422(b) on August 6, 2024. (*See* Indictment, ECF No. 15.) On November 18, 2025, Ms. Cranick appeared before the Honorable Kari A. Dooley, United States District Judge, and pleaded guilty to count one of the Indictment in accordance with a plea agreement with the government. (PSR ¶¶ 1, 3; Plea Agreement, ECF No. 62.)

Ms. Cranick faces a mandatory minimum sentence of 10 years' imprisonment and a maximum sentence of life imprisonment. 18 U.S.C. § 2422(b); PSR ¶ 111. She also faces a term of supervised release of five years to life, a maximum fine of $250,000, a $100 special assessment, a $5,000 mandatory assessment under the Justice for Victims of Trafficking Act ("JVTA"), 18 U.S.C. § 3014,[3] and up to $50,000 in an additional assessment under 18 U.S.C. § 2259A(a)(3). (PSR ¶¶ 120, 124–27.)

The PSR calculated Ms. Cranick's total offense level under the United States Sentencing Guidelines to be 43.[4] (PSR ¶ 65.) She has no criminal convictions and therefore falls within Criminal History Category I. (PSR ¶ 70.) As a result, the PSR

---

[3] The JVTA assessment applies only if the Court determines that Ms. Cranick is not indigent.

[4] At sentencing, because Ms. Cranick has assisted authorities by timely notifying the government of her intention to plead guilty, the government intends to make a motion that the Court award the third point for acceptance of responsibility under U.S.S.G. § 3E1.1(b).

concluded that Ms, Cranick's advisory Guidelines range is life imprisonment. (PSR ¶ 112.) The PSR further calculated that her advisory supervised release term is at least five years, (PSR ¶ 121), and the advisory fine range is $50,000 to $250,000. (PSR ¶ 126.)

### 3.    The § 3533(a) Factors

### 3.1.    The Nature, Circumstances, and Seriousness of the Offense

*"She encouraged him to lie to us, his parents, while she texted me* ███████████████ ███████████████████████████████*, covering her tracks with lies."*

- M.V.'s Mother, VIS

What distinguishes this case is not only the age of the victim, though the fact that M.V. was only 11 years old when the abuse began is itself deeply aggravating. What distinguishes this case is the comprehensive and methodical nature of the betrayal that made the abuse possible. Ms. Cranick did not exploit a single relationship of trust; she exploited all of them.

**Familial trust.** M.V.'s family considered Ms. Cranick a trusted family friend. ████████████████████████. His parents had every reason to welcome Ms. Cranick's presence in their son's life—and no reason to suspect that she would use that presence to sexually assault him.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

**Relational trust.** M.V. initially trusted Ms. Cranick as a friend. When she talked about running away together, he took the comments "as a friend." (*See* PSR ¶ 12.) She exploited his age-appropriate naivete to convert a friendship into a sexual relationship he did not seek and could not meaningfully consent to.

This offense required Ms. Cranick to betray trust across every domain of M.V.'s life. That kind of comprehensive betrayal is not the product of a momentary lapse. It was a sustained campaign of exploitation requiring adult-level planning and deception at every stage.

And the planning was extraordinary. Ms. Cranick migrated communications to Discord to evade parental monitoring. She hid in bushes outside M.V.'s home at night and fed him real-time intelligence about who was awake. She rotated among locations. She drove a child to her own workplace—a school, near the playground—and assaulted him in her vehicle. She calibrated her gifts to avoid suspicion, giving cash instead of an airsoft gun and energy drinks to counteract the sleep deprivation her late-night assaults were causing. Each of these decisions reflects adult strategic thinking of a high order.

When M.V. tried to end the relationship, Ms. Cranick did not stop. She continued to press, emotionally manipulating him and attempting to arrange meetings even as he told her he could not continue. M.V. told Ms. Cranick "no means no." She persisted. A ███████ boy was drawing firmer boundaries than the defendant.

The harm has been severe. M.V. began cutting himself. The abuse was not disclosed for over a year; it came to light only because M.V.'s mother discovered bloody tissues and fresh cuts on his arms. As the victim's mother has recounted in her victim impact statement, the trauma extends to M.V.'s entire family.

The defense advances several arguments that seek to minimize the seriousness of this offense. But as explained below, none withstands scrutiny.

### 3.1.1.  The Psychological Evaluation's Findings

Ms. Cranick leans heavily on the psychological evaluation's conclusion that she does not meet the clinical criteria for pedophilia. But clinical taxonomy is not a sentencing factor. The evaluators treat the absence of a diagnosis as though it were exculpatory—as though the relevant question is *what Ms. Cranick is* rather than *what Ms. Cranick did*. Section 3553(a) asks this Court to evaluate the nature and circumstances of the offense and the need for just punishment and deterrence, not to classify the defendant by clinical type. Ms. Cranick sexually assaulted a child between 10 and 20 times over the course of a summer. Whether or not a psychologist would apply a particular diagnostic label does not diminish the severity of what she did to M.V. or what M.V. suffered as a result.

11

### 3.1.2.  The Theory of "Regressive Attachment Vulnerability"

*"She was strategic in grooming my son, an 11-year-old boy, manipulating him into believing they were romantically involved."*

- M.V.'s Mother, VIS

The defense's central theory, developed through a psychological evaluation conducted by Dr. Andrew Meisler and Dr. Mayumi Gianoli, is that Ms. Cranick experienced a psychological "regression" caused by stressors—her father's cancer diagnosis, occupational stress, ██████████████████████.—superimposed on a lifelong anxious-dependent attachment style. (*See* Def.'s Ex. A, ECF No. 69 at 10.) (hereinafter "Mitigation Report"). This confluence, the evaluators posit, caused Ms. Cranick to "unconsciously" develop a "pathologic over-identification" with her daughter's role as M.V.'s girlfriend, (*id.* at 9), leading her to act out "unfulfilled psychological needs and desires rooted in an adolescent mindset," (i*d*. at 7).

The government does not question the evaluators' credentials. But their theory is internally inconsistent and does not justify imposing a more lenient sentence.

*First*, the conduct contradicts the theory. Someone operating in a regressed, adolescent mental state does not execute the kind of operational planning Ms. Cranick employed: migrating communications to an alternative platform to evade parental monitoring, conducting real-time surveillance of the victim's household, calibrating gift-giving to avoid detection, coaching the victim to lie to his parents, and preparing cover stories for coded bracelets. These are adult decisions requiring adult cognitive functioning. The evaluators do not address any of this conduct in their analysis.

*Second*, the evaluators' own testing did not support their theory. The Attachment Style Questionnaire—the one tool in the battery specifically designed to measure the attachment vulnerabilities at the heart of the defense's theory—returned results indicating a secure attachment style with no significant attachment anxieties. (*See id.* at 6.) These results directly contradicted the evaluators' hypothesis. But rather than accept what the data showed, the evaluators overrode it, attributing the results to "poor insight" and "an overly positive" self-presentation. (*See id.*) The Court should consider the significance of this: the empirical instrument most closely aligned with the defense's central theory produced results that refuted it.

*Third*, the evaluators themselves concede the limits of their own theory. They acknowledge that Ms. Cranick "was not psychotic or otherwise gravely impaired" and that "the evidence does not support that she was incapable—from the clinical-legal standpoint—of controlling her actions due to a severe mental disease or defect." (*Id.* at 8.) They further acknowledge that Ms. Cranick "does not suffer from a diagnosable mental disorder." (*Id.* at 9.) The defense is thus asking the Court to impose only the mandatory minimum for a defendant whose own experts say was not clinically impaired, had no diagnosable condition, and was capable of controlling her behavior.

*Fourth*, when confronted by investigators—both during the summer of 2022 and a year later—Ms. Cranick denied all wrongdoing. She denied inappropriate contact. She denied initiating any kind of sexual relationship with M.V. And she claimed that M.V.—the child—had tried to kiss her. The evaluators attempt to reframe this as "deep and genuine psychological denial" rather than her understanding that what

13

she had done was wrong and a concomitant, calculated effort to escape accountability. (*Id*. at 7.) This victim blaming is inexcusable.

*Fifth*, the evaluators point to the lifeguard observations that Ms. Cranick was acting like a "schoolgirl" as evidence of her regressed state. (*See id*. at 7.) But those same lifeguards were so alarmed by what they observed—a 41-year-old woman isolating herself with a child, placing her hand on his shorts or thigh—that they spent more time watching Ms. Cranick than the lake and eventually reported her to the CSP. The evaluators reframe a fact that demonstrates how visibly predatory Ms. Cranick's behavior was as evidence that she was psychologically diminished. It was not. It was evidence that her flirtatious and sexual behavior with an 11-year-old child was obvious enough to concern bystanders, who were primarily minors themselves at the time.

*Finally*, even crediting the evaluators' theory in full, it does not support the mandatory minimum. The evaluators describe Ms. Cranick as having "poor insight" into her thinking, feeling, and behavior. But poor insight is an aggravating factor, not mitigating. It is a description of someone who chose not to reflect on the harm she was causing because it was convenient not to. Many offenders have explanations for why they committed their crimes. Explanations are not exculpation. Her lack of insight—even now more than a year after her arrest and detention, is a cause of concern.

### 3.1.3.  Characterizing Ms. Cranick's Conduct as "Aberrant"

*"In the fall of 2022,* ███████████████████ *— The light went out of him."*

- M.V.'s Mother, VIS

Ms. Cranick characterizes the offense as a departure from an otherwise ordinary life—"one terrible summer." (Def.'s Sent'g Mem. at 6.) "One terrible summer" might be a reasonable way to characterize a summer of infidelity in her marriage, but it is a gross mischaracterization of Ms. Cranick's repeated and persistent sexual abuse of an ████████████ child who asked her stop. The offense spanned an entire summer with 10 to 20 distinct sexual assaults, thousands of messages, and continued attempts to reengage M.V. into September. The pattern-of-activity enhancement under § 4B1.5(b) exists precisely because this was not a single aberrant act. And when M.V. tried to end it, Ms. Cranick did not stop. That is persistence, not aberrance.

### 3.1.4.  Guidelines Disproportionality

Ms. Cranick argues that the life Guidelines range is disproportionate compared to ranges for Hobbs Act robbery and RICO murder. Congress and the Sentencing Commission have made a policy judgment that offenses involving the sexual exploitation of children warrant the enhancements that produce this range. The Court can vary from the Guidelines, but the comparison to other offense types does not establish that the Guidelines are invalid. *See United States v. Brown*, 843 F.3d 74, 83 (2d Cir. 2016) (holding *de facto* life sentence for production of CSAM reasonable "even considering that there may be . . . 'more serious' crimes such as intentional murder.").

15

### 3.2.    History and Characteristics of the Defendant

*"This was not a stranger. This was someone we trusted — a friend,* ████████████
████ *."*

- M.V.'s Mother, VIS

Ms. Cranick has no prior criminal history. She has a family, including a husband, two children, and aging parents, who depend on her. The government does not minimize these facts, and they are among the reasons the government recommends 240 months rather than a higher sentence.

But Ms. Cranick asks the Court to go much further and impose only the statutory minimum based in substantial part on the collateral consequences of incarceration for her family. This argument appears often in sentencing memoranda, but courts routinely recognize that collateral family consequences cannot drive the sentencing calculus when the offense is this serious. M.V.'s family also trusted Ms. Cranick. Their child was sexually exploited by someone they welcomed into their home. Their son began hurting himself as a result. The Court should weigh the consequences for both families.

### 3.3.    Just Punishment, Respect for the Law, and Deterrence

*"My son is still growing, healing, and trying to understand a world that no longer feels safe."*

- M.V.'s Mother. VIS

A sentence of 240 months is proportionate to the offense: a sustained pattern of sexual assault against a child, perpetrated through an elaborate grooming

campaign that exploited every dimension of trust in the child's life. The mandatory minimum is not.

General deterrence is critical. Adults in positions of trust—parents, coaches, teachers, family friends—must understand that exploiting access to children carries consequences commensurate with the betrayal. Sex crimes against children are significantly under-detected and under-reported. *See* Patti B. Saris et al., U.S. Sent'g Comm'n, *Report to Congress: Federal Child Pornography Offenses* 295 (2012) ("It is widely accepted among researchers that sex offenses against children often go unreported and undetected."). It is vitally important to deter those who would commit such crimes by imposing significant sentences. A sentence at the mandatory minimum would send the wrong message.

### 3.4.    Protection of the Public

Twenty years of incapacitation, followed by a lifetime of supervised release with the extensive conditions outlined in the plea agreement, provides robust protection of the public.

The defense's evaluators scored Ms. Cranick as "low risk" on the Level of Service Inventory–Revised and identify several additional protective factors they contend further reduce her recidivism risk. (Mitigation Report at 6.) Even crediting this assessment, specific deterrence is only one of several purposes of sentencing under § 3553(a)(2). The sentence must also reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to others.

Moreover, the evaluators themselves acknowledge that "few, if any, measures of recidivism risk" exist for female sex offenders, and that the actuarial instrument most commonly used in this context—the STATIC-99R—"was not developed or normed for women." (*Id.*) The Court should weigh the certainty of the risk assessment accordingly.

### 3.5.    Avoiding Unwarranted Sentencing Disparities

Ms. Cranick argues implicitly that § 3553(a)(6)'s concern with sentencing disparities supports a sentence at or near the mandatory minimum. In doing so, she compares her case to a handful of others in which courts imposed below-Guidelines sentences for child exploitation offenses. The government respectfully submits that this exercise is of limited utility and that the Court should decline the invitation to use other cases as a benchmark for the sentence in this one.

Section 3553(a)(6) directs sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The Second Circuit has consistently held that this inquiry is a *national* one: it is concerned with systemic uniformity across the federal system, not with replicating the outcomes of individual cases before other judges. *See United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) ("[S]ection 3553(a)(6) requires a district court to consider nationwide sentence disparities, but does not require a district court to consider disparities between co-defendants."); *United States v. Hatala*, 552 F. App'x 28, 31 (2d Cir. 2014) ("[T]he disparity referenced by 18 U.S.C. § 3553(a)(6) is national, not case- or district-specific."). The primary

mechanism for achieving that national uniformity is the Guidelines themselves. *See United States v. Irving*, 554 F.3d 64, 76 (2d Cir. 2009); *United States v. Sanchez*, 989 F.3d 523, 541 (7th Cir. 2021) ("[T]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly."); *United States v. Saez*, 444. F.3d 15, 19 (1st Cir. 2006) ("At the present time, the guidelines themselves are almost certainly the best indication of ordinary practice since most sentences are within the guidelines.").

The difficulty with case-by-case comparisons is not merely doctrinal; it is practical. Every sentencing is the product of a unique combination of offense conduct, criminal history, personal history, victim impact, mental health, family circumstances, available supports, cooperation, and dozens of other variables—some of which are never captured in a written opinion. The inevitable result, as the First Circuit has observed, is that the parties end up finding "random examples to support a higher or lower sentence, as their clients' interests dictate." *Saez*, 444 F.3d at 19. And even where two cases appear comparable, there is "no principled basis on which to say that the appropriate sentence for a similarly-situated defendant" was one outcome rather than the other. *United States v. McDowell*, 676 F.3d 730, 733 (8th Cir. 2012). The Court is better served by conducting the individualized assessment that the statute requires—weighing the specific aggravating and mitigating features of this case under each § 3553(a) factor—than by attempting to triangulate between sentences imposed in materially different cases before other judges.

To the extent the Court nonetheless considers the defense's cited cases, each is readily distinguishable.

- In *United States v. Khedkar*, No. 24-14203, 2025 WL 3628103, at *1 (11th Cir. Dec. 15, 2025), the defendant received 150 months for attempting to meet a child for sexual activity. But no actual child was involved—the defendant was communicating with an undercover agent. There was no real victim, no actual sexual abuse, and no documented harm. The comparison to a case involving 10 to 20 completed sexual assaults against a real child is inapt.

- *United States v. Hammond*, 698 F.3d 679 (8th Cir. 2012), involved a 240-month sentence for enticement and production of child pornography involving an eleven-year-old victim. The defense cites *Hammond* for the proposition that 240 months represents a ceiling. It does not. *Hammond* involved a different factual record, a different defendant, a different judge, and a different set of § 3553(a) considerations. What *Hammond* does demonstrate is that courts have imposed sentences of 240 months in cases involving the sexual exploitation of children of the same age, which undermines the claim that the government's recommendation is disproportionate.

- In *United States v. Leroy*, No. 16-0243, 2017 U.S. Dist. LEXIS 102745, (W.D. Pa. July 3, 2017), the defendant received 360 months after trial for offenses involving multiple minor victims. The government in that case requested 262 to 327 months. The defense cites *Leroy* as evidence that 240 months is too high for a single-victim case. But this again illustrates the peril of case-by-case comparisons: *Leroy* involved materially different facts, and a sentence of 240 months for Ms. Cranick—who pleaded guilty to a single count—is well below what the government sought in that case.

- Ms. Cranick also cites a New Mexico state case where the defendant received 180 months for a single incident of sexual assault involving force. A state-court sentence imposed under a different statutory framework and sentencing regime is of limited comparative value. In any event, the sustained and calculated nature of Ms. Cranick's offense—10 to 20 assaults perpetrated through a months-long grooming campaign that exploited multiple relationships of trust—is materially more serious than a single-incident case.

In sum, § 3553(a)(6) does not require the Court to match the sentences imposed in other cases. It requires the Court to be mindful of national disparities, a concern best addressed by careful attention to the Guidelines and to the individualized assessment the statute demands. The government's recommendation of 240 months is the product of that assessment, and it reflects the specific facts of this case, not an attempt to replicate or distinguish the outcomes in others.

## 4.    Conclusion

*"The defendant made a choice. A deliberate, calculated, and selfish choice. She chose to steal my son's innocence, permanently altering the course of his life and inflicting pain on our entire family."*

- M.V.'s Mother, VIS

Over the summer of 2022, Ms. Cranick used her position as a trusted family friend, ███████████████████ to gain access to and sexually assault an 11-year-old child between 10 and 20 times. Her conduct was calculated, sustained, and devastating in its consequences: M.V. began cutting himself, and the abuse left permanent unseen wounds on M.V. and his entire family. Ms. Cranick's own experts acknowledge that she was not clinically impaired, does not suffer from a diagnosable mental disorder, and was capable of controlling her actions. Their evaluation does not support a sentence at the mandatory minimum, and neither do the facts.

The government's recommendation of 240 months takes into account the mitigating factors Ms. Cranick has identified, including her acceptance of responsibility, her lack of criminal history, and the impact of incarceration on her family. But the sentence must also account for the seriousness of the offense, the need for just

punishment, the importance of deterrence, and the protection of the public. A sentence of 240 months' imprisonment, followed by a lengthy term of supervised release, is sufficient, but not greater than necessary, to achieve these goals. The government respectfully requests that the Court impose such a sentence.

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

DANIEL E. CUMMINGS
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv206702
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: (203) 821-3700
Fax: (203) 773- 5376
Daniel.Cummings@usdoj.gov

KATHERINE E. BOYLES
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv20325
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: (203) 821-3700
Fax: (203) 773- 5376
Katherine.Boyles@usdoj.gov

## **CERTIFICATION**

I hereby certify that on March 6, 2026, a copy of the foregoing was filed electronically with the court and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

DANIEL E. CUMMINGS
ASSISTANT U.S. ATTORNEY